# REPORTS.

## CHESHIRE.

### DECEMBER TERM, A. D. 1853.

---

## FARRAR & a. v. CROSBY & a.

A bill in equity alleged that the respondents, who were the mortgagees of certain personal property, agreed to hold it in trust for the common benefit of themselves and the orators, who were also mortgagees of the property. This allegation was denied by the answers, and was not proved by the testimony. *Held,* that as the orators were bound to prove the case substantially as it was alleged, and failed to prove it, the bill must be dismissed.

IN EQUITY. The following case is stated in the bill.

The orators are Daniel M. Farrar and David Pearson, late partners under the name of Pearson & Farrar, and Daniel D. Foster.

The respondents are Ebenezer B. Walker, Lewis Broad and Edwin Fuller, partners under the name of E. B. Walker & Co. and Alpheus Crosby, David W. Farrar and Edward P. Kimball.

On and before the 19th day of April, 1847, Walker & Co., then temporarily residing at Troy, were contractors on the 11th and 12th sections of the lower divisions of the Cheshire Railroad, and possessed personal property to a large amount in Troy and Fitzwilliam, suited for the performance of their contract, and in value more than $2,500.

Walker & Co. owed the following debts:

To the orators, { Pearson & Farrar, ............ $657,77
{ Daniel D. Foster, ............... 150,00

To the { Alpheus Crosby, ............... 473,00
Respondents, { David W. Farrar, .............. 508,32
{ Edward P. Kimball, ............ 361,92

They were embarrassed and unable to pay these debts, which were then due, and for the payment of a large part of which they were then called upon. Walker, acting for the firm, then proposed to secure the above debts by a mortgage on the above-named property, if they could be so secured that all the creditors should stand on equal grounds, and hold the property for the payment of all said sums, equally, in proportion to the amount of the claims. Thereupon the orators, the respondents and Walker met at Troy, when he proposed to execute the mortgage. The creditors then agreed to accept Walker's proposition that the property should be sold, at a convenient time, to the best advantage, and the proceeds applied *pro rata* to the payment of the above debts. The mortgage was made. The parties were ignorant of the law of New Hampshire as to the place of recording such deeds, but believed it was necessary that a deed should be recorded in the town where the property was situated, and agreed, for the purpose of carrying out the intention of the parties, that there should be two mortgages, one to the orators and the other to Crosby, Farrar and Kimball, three of the respondents, to secure their debts, respectively; that all the property in both towns should be included in each mortgage, and that both deeds should be recorded in each town; that the deed to the orators should be first recorded in Fizwilliam, and the other deed should be first recorded in Troy, in order that the claims of all should be equally secured as near as might be. This arrangement was effected and the mortgages were made, and it was supposed by all, that the mortgage to the orators would have

Farrar v. Crosby.

precedence as to all the property in Fitzwilliam, and that the other mortgage would have precedence as to all the property in Troy. The property in Fitzwilliam was more than enough to pay the debts due the orators. The mortgagees agreed to hold the property in trust for the common benefit of all.

Walker & Co. were permitted to use the property for a short time, in completing their work. In the summer or fall the respondents took possession of all the property, and sent a large part of it into Massachusetts, and there sold it, for which they received $700, and also sold other parts of it, for which they received the money. A part of it was sold under their direction, unfairly, improperly and fraudulently, and for less than its value, which the respondents purchased and re-sold for much more than they gave for it. The mortgaged property was sufficient to pay all the debts and expenses of sale, and if it had been properly sold, the proceeds would have paid all the debts. The orators have received none of the proceeds, and their debts are still unpaid.

The orators have repeatedly requested the respondents and particularly on the 26th of April, 1849, to account with them, and pay over the proceeds of the mortgaged property, according to the original agreement.

The bill prays that the respondents may be decreed specifically to perform their agreements, to account for the value of the property mortgaged, and to pay to the orators the amount of their debts, to perform all the trusts in favor of the orators, and for general relief.

The answer of Crosby and Farrar is as follows: Farrar says that on the 19th of April, 1847, Walker & Co. owed him, and Crosby says they owed him also; and the respondents believe that they also owed the other persons mentioned as creditors in the bill. They deny that Walker ever proposed to mortgage property belonging to Walker & Co., to secure the debts due to the orators, on condition that all

the creditors should be paid in proportion to their debts. They also deny that the parties ever met for the purpose of making such a mortgage. They deny that the parties' ever agreed that the proceeds of the property should be applied *pro rata* for the benefit of the creditors.

They say that on the 19th of April, Walker & Co. owed Crosby and Farrar, who desired to secure their debt; that each of them commenced a suit against Walker & Co., intending to attach their property, of which Walker was notified; that he proposed to give them a mortgage, which was partly made, when it was proposed that Kimball should be called in, and his debts should also be secured by the mortgage, and this was done. While the mortgage was making, it was proposed to Walker that the orators should be secured, and D. M. Farrar was sent for. The mortgage was completed before his arrival, and when he came a second mortgage of the same property was made, subject, as the respondents believe, to the mortgage to Crosby, Farrar and Kimball.

The respondents suppose that the persons present believed that such mortgages should be recorded in the town where the property was situated. It was then proposed by a third person that the orators' mortgage should be sent to Fitzwilliam, and there recorded, while the mortgage to the respondents was being recorded in Troy. They deny that the suggestion was made in accordance with any such agreement as is set forth in the bill, or that the orators' debts were meant to be secured in the same deed with the debts due the respondents. They say they had taken measures to secure their debts, respectively, before anything was said, in their hearing, about the orators' debts; and they understood that the respondents' debts should have priority over the orators' debts, so far as the mortgages might affect them; and they know of no agreement that the claims of the creditors should be equally secured by the mortgages. They believe that the property mortgaged was sufficient to secure

all the debts. They cannot say what articles mortgaged were in Troy and what in Fitzwilliam, but they suppose that the most valuable part of the property was in Troy.

They deny that they held the property in trust for the common benefit of all the mortgagees. They deny that they took possession of all the mortgaged property, or caused any part of it to be sold in Massachusetts. They say that after Walker & Co. had completed their work they carried a large part of the property into Massachusetts, without the knowledge and consent of the defendants; and that before this time much of the property had been consumed by Walker. After Walker & Co. had gone to Massachusetts, the respondents, in order to secure the mortgage debts, took such property as they could find in Troy, advertized it, and fairly and honestly sold it. They admit that they bought some of the property at the auction, and that they have disposed of it; but they deny that the value of the property, when it came into their possession, exceeded the amount of the debts and the expenses of the sale. They say that the value of the property fell short of the sum due upon their mortgage, and that all they received was less than the amount of their debts. They aver that they did not take possession of any part of the property until after Walker had left the work.

They admit that about the 26th of April, 1849, the orators made a request of them, as the bill alleges, and that they did not comply with it.

It was not in consequence of the belief that the mortgage should be recorded in the towns where the property was, that two mortgages were made instead of one. They cannot say whether it was believed, when the mortgages were executed, that if all the property was included in both mortgages, and both put on record in each town, it would give a prior right to the mortgage first recorded where the property was situated; but they say it was not owing to any such belief that two mortgages were made instead of one. The

property taken by the respondents, in December, 1847, was sold at auction on the 6th of March, 1848, for the sum of $467,90. On the 25th of November, 1848, they sold other property for $7,57. Kimball received of Walker $157,51, as the avails of property mortgaged and sold by Walker.

In June, 1848, Farrar and Kimball authorized Crosby to go to Massachusetts and obtain payment of the debt secured by the mortgage, and he went and brought back a note from Gilmore and Carpenter for $608, payable in three months, which was paid in September, 1848. In December, 1847, Farrar received the further sum of $18 from Walker. Crosby says that he sold all the interest of the respondents in the mortgaged property to Gilmore and Carpenter for $608, and accounted for that sum to the respondents.

Farrar says that on the 24th of March, 1849, there was due on the notes secured by the mortgage the sum of $1,503,52
Amount received for the property,..................1,340,24

Balance due,...........................163,28

This account does not include expenses, which were between $80 and $90.

The amended answer includes a schedule of the property sold at auction and the prices, and states that the orators, or one of them, was present at the auction, and that all of them were notified of the time and place of sale.

The material allegations in the bill are

I.   That the mortgages were for the equal benefit of all the creditors.

II.   That the property should be sold, and the proceeds applied *pro rata* to the payment of all the debts.

III.   That the property should be held by the mortgagees, in trust for the common benefit of all.

IV.   That the respondents sold the property unfairly and fraudulently.

All these allegations are denied by the answer.

The answer of Kimball denies any agreement, but says it was his understanding, and, he thinks, that of all concerned, that the effect of the mortgages recorded above would be to put all the mortgagees on equal ground.

The mortgage to the orators is dated 19th of April, 1847, and is to secure a note to Pearson and Farrar for $657,77, and one to Foster for $150, both dated 19th of April, 1847.

The parties swear that it was made for the purpose of securing the demands specified in the condition, and for no other purpose whatever.

The mortgage to the defendants is dated April 19th, 1847, to secure Crosby, Farrar & Co., a note dated April 19th, 1847, for $508,32, and a note to David W. Farrar for $361,92, and payable to E. P. Kimball, also a note to Alpheus Crosby.

Evidence was taken on both sides.

It appeared from the testimony of E. B. Walker, on the part of the plaintiffs, that it was agreed that each mortgage should contain all the property situated in both towns, and that all the mortgagees should share equally in proportion to their respective claims. All the mortgagees were present and within hearing. At first, it was intended to have all the debts secured by one mortgage, and a mortgage was commenced; and when it was concluded to have two mortgages all were to share equally.

John A. Cutter testified that Crosby said there was an agreement that the mortgagees should share equally, and they talked of having only one mortgage, but afterwards altered their plan and had two. There proved to be a "hole in the mortgage," and the law appeared to be on Crosby's side.

James Farrar saw Walker sign the two mortgages at one sitting down.

Joshua Wyman said that the substance of the talk among the parties was that the mortgages were to be for the benefit of all the creditors who were there, and that all were to

share alike. It was said there was probably property enough to satisfy them all.

Joseph Haskell got the impression from Crosby that the mortgagees were to share in the property in proportion to their claims. Crosby said he thought there might be property enough to pay the mortgages and other debts.

· He said they had taken a mortgage or mortgages in company.

It appeared on the part of the defendants, from the evidence of Daniel M. Farrar, father of David W. Farrar, the respondent, that before the mortgage to the respondents was finished, Foster and Daniel M. Farrar came, and it was then agreed that another mortgage should be made to the orators, and intended to be subject to the other. No one proposed that all the mortgagees should have an equal security, nor that the proceeds of the property should be disposed of in proportion to the claims, nor that the mortgagees should hold the property in trust for the benefit of all.

Joseph M. Putney understood Daniel M. Farrar to say that he did not claim the property on the 12th section, but did claim on the 9th.

James Corey heard Pearson say, several times, that he had sold out his interest in the Walker debt to Daniel M. Farrar. He also said that he always supposed his mortgage and Farrar's was subject to Crosby and Farrar's.

John Amidon, in the fall of 1848 heard Foster say he had got his pay on the Walker debt.

Edward Farrar testified that nothing was said about the mortgages being for the common benefit of all, so that none should have priority over the others, nor that the proceeds of the property should be applied in proportion to the claims, and nothing was said about securing all the debts by one mortgage.

The mortgages were signed nearly at the same time.

Josiah Pratt, in 1847, heard Daniel M. Farrar say he had

a mortgage which was given after a mortgage to Crosby and Farrar.

*Wheeler*, for the plaintiffs.

1. The complainants rely upon the evidence in the case to prove an agreement between all the parties interested, in substance, that all the property included in both mortgages should be held for the common benefit of all the mortgagees, and that the proceeds should be applied to the payment of all debts of the the mortgagees *pro rata.* Proof of the agreement is to be found in the depositions of E. B. Walker, Joshua Wyman, John A. Cutter and others. The complainants claim an account of the debts and the property, and an enforcement of the original agreement. Under the agreement which is here relied upon, the question as to who has the better legal title by prior mortgage is unimportant.

2. The agreement constitutes a trust in whatever property should come into the hands of either of the mortgagees for the benefit of all the others. And it is in proof that most of the property included in both mortgages, or the proceeds thereof, came into the possession of the defendants prior to the filing of the bill, and that they now hold the proceeds.

This is a trust which a court of equity will compel the parties to execute. Trusts in personal property may be created and proved by parol evidence. *Fordyce* v. *Willis*, 3 Brown's Ch. Rep. 577 and note; *Benbow* v. *Townsend*, 1 Mylne & Keene 506; *Bayley* v. *Boulcott*, 4 Russell 345; *McFadden* v. *Jenkyns*, see note in 6 Harrison's Dig. 1713; Phillips 153; 7 Jurist 27; 12 Law Jour. N. S. 146; *Thynn* v. *Thynn*, 1 Vernon 296; *Oldham* v. *Litchfield*, 2 Vernon 506; *Taylor* v. *Mayrant*, 4 Desausure 505; *Kirkpatrick* v. *Davison*, 2 Kelly 297; *Martin* v. *Greer*, 1 Georgia Decis. 109; *Lord* v. *Lowry*, 1 Bailey's Ch. Rep. 510; *Harder* v. *Harder*, 2

Sandford's Ch. Rep. 17; *Porter* v. *Rutland Bank*, 4 Washburn 410; *Tilton* v. *Tilton*, 9 N. H. Rep. 385.

3. Trusts in personal property are not within the provisions of the statute of frauds. Rev. Stat. ch. 130, §§ 7, 8. The trusts which are required to be in writing by our statute are expressly confined to real estate. Rev. Stat. ch. 130, § 13. Before the statute of frauds, parol contracts concerning lands were enforced in equity, and the rule is still unchanged, except in case the party insists upon the benefit of the act. *Newton* v. *Sawzey*, 8 N. H. Rep. 1.

Jurisdiction is given to this court by statute, in cases of trust, and to compel the specific performance of contracts. Rev. Stat. ch. 171, § 6.

4. The agreement upon which the complainants rely does not conflict with the terms of the mortgages, nor does it tend to impair their efficiency in furnishing security to the mortgagees, but is something superadded, which might be for the common benefit.

5. The agreement was in part performed, by the defendants being permitted under it to record their mortgage first in Troy, by their taking possession of part of the mortgaged property, &c., and it is a fraud in them to attempt to hold the proceeds of all the property to satisfy their own debts, to the exclusion of the complainants. They should be compelled to account for the full value of the property as ascertained at the final sale.

The part performance of the contract furnishes a distinct ground for the interference of a court of equity. 2 Story's Eq. Jur. § 759 and authorities cited.

*Cushing*, for the defendants.

The bill alleges a trust; that the complainants' mortgage was to have a priority as to the property in Fitzwilliam, and the respondents' mortgage was to have a priority as to the property in Troy, and that the mortgagees of each mortgage were to hold the property in their mortgage, in trust

Farrar *v.* Crosby.

for the equal benefit of all; that the property was to be sold for the common benefit, and in all matters relating to the disposition of the property, the bill seeks to treat the parties to each mortgage as trustees for the benefit of the parties to the other mortgage.

The bill, if to be maintained at all, must be maintained on this ground; and if the evidence will not support this allegation, the bill must, as we apprehend, fail.

Now it is worthy of remark, that there is not a single word in any of the testimony which speaks of any express trust. No one of the witnesses speaks of any thing being said about the property being held in trust, and there is nothing said about any sale, except what is said by Walker, that he requested as a favor that he might be permitted to dispose of some of the property, not wanted for use, on condition that he should pay the proceeds to either of the mortgagees. But that either of the mortgagees should sell, was a matter not mentioned by either of the witnesses.

There is also an allegation that the parties supposed that a priority would be given by the record; that the complainants would gain priority in one town and the respondents in the other.

This allegation is also utterly unsupported by the evidence. E. B. Walker says no such thing, and Wyman says no such thing; neither does any of the witnesses mention it.

The case made by the complainants' witnesses, taking it all to be true, is that the parties being altogether, agreed, in the first place, to have all the debts secured by one mortgage; that it being suggested that some of the property might get attached before the mortgages could be recorded in both towns, it was concluded to have two mortgages, which should each be recorded in both towns, and that the parties should all share the property in proportion to their respective claims.

Now this being the transaction which the complainants'

witnesses prove, the first question which arises is, what would be the legal effect of such a transaction? If there be any trust, it must be one arising by implication, because the legal effect would be different from what the parties intended.

The witnesses say that the parties agreed to secure all the claims by a single mortgage, and that the actual transaction was designed to produce the same result.

Had all the claims been secured by a single mortgage, made to all the creditors, the mortgagees would have been tenants in common of the property, each holding in proportion to the amount of his debt.

This was precisely the legal effect of the transaction, as proved by Walker and the other of the complainants' witnesses. They say that the mortgages were made at the same time, executed at one sitting, that neither was designed to take priority over the other, and they leave it uncertain which was actually executed first.

The principle is, we apprehend, well settled and familiar, that, so far, the effect of the transaction would be in law to make all the mortgagees tenants in common. It would be precisely the same as if there had been only one mortgage.

The cases of *Smith* v. *Moore*, 11 N. H. Rep. 55, and *Stone* v. *Meserve*, 13 N. H. Rep. 46, are authorities to show that priority of registry would not give any priority of legal title, in a case like the present, where the parties all had knowledge of the contents of the mortgage, and did not intend or expect to give one a priority over the other.

The legal effect, then, of the transaction, as proved by the complainants' witnesses, was to make the parties tenants in common of all the mortgaged property; it was, in fact, to carry out exactly the original agreement, to have all the property included in one mortgage.

The legal effect of the transaction being, then, exactly what the parties designed, there is no occasion to imply a

trust, and there is certainly no evidence of any express trust.

It thus appears by the complainants' own testimony that the case made by the bill wholly fails, and there is no occasion for any proceeding in chancery, no pretence for granting the relief prayed for, and in fact no case which could be stated by way of amendment, on which any relief could be granted.

The complainants, on their own showing, have a perfect remedy at common law. There was no agreement to carry out; the whole agreement was executed; the parties had become in law tenants in common of the property, and either party would have his remedy against the other for any unauthorized sale of the property.

This view of the case is confirmed by the respondent, Kimball, who while he denies in his answer all knowledge of any trust, and of any agreement, says that he believed, and he has no doubt that all the parties believed the legal operation of the transaction would be to put the parties on equal ground, i. e. make them tenants in common.

But while stating the result of the complainants' testimony, we by no means intend to admit that this is the true state of the case.

The complainants' mortgage stated distinctly that the property had already been included in another mortgage. The words are, " the same articles are contained in a mortgage to Alpheus Crosby, David W. Farrar, and E. P. Kimball, which is subject," &c. The last words, " which is subject," are ambiguous, and whatever they may mean, would not affect the title of a prior mortgagee, but the whole clause distinctly recognizes a prior mortgage. Not prior merely by registry, but prior in point of time, and so intended to be.

Is there in the whole evidence anything to control this statement, appearing in the mortgage of the complainants?

Does it appear that there was a union of minds on this matter, amounting to an agreement or understanding that

the respondents really consented that their mortgage thus shown to be prior in point of time, should in fact be considered as contemporaneous with that of the respondents.

The direct proof of this rests on the testimony of E. B. Walker, who says, in substance, the mortgagees were all present when the agreement that all should share alike was made, from which the respondent's assent is to be inferred, and the testimony of Wyman, who says, in answer to interrogatory 13th, that the respondent did not dissent.

On the other hand, Kimball, while he admits that he understood that the effect would be to put all on the same footing, expressly denies all knowledge of anything being said about it, so that it is plain that all did not understand it as the complainants' witnesses say they did.

Daniel M. Farrar, who was present during the whole time, supposed the respondents' mortgage prior in fact, and heard nothing to the contrary.

Edward Farrar also heard nothing about the mortgages being on equal ground.

We may, under such circumstances, well credit the respondents, Crosby and Farrar, when they deny all knowledge of any understanding that their mortgage was not to be prior.

Either way, then, the complainants have no case.

On their own showing, they are tenants in common, with adequate legal remedies and with no equity, i. e., no case for chancery jurisdiction.

The allegations of trust in the bill wholly fail, and there is no ground furnished by the evidence, for any of the relief prayed for in the bill.

*Wheeler*, for the plaintiffs, in reply.

The complainants admit that they must make out, substantially, the material allegations in the bill, to entitle them to relief. This may be done by the respondent's admissions in the answer, by the testimony in the case, or by both taken

together.   They also admit that the words " trust," and " express trust," are not proved to have been used by the parties. But they contend that they have shown an agreement, and a state of facts existing between the parties, which created a trust, and which must have been so understood by them at the time, and further, that this agreement has been in part performed by the parties.   The complainants rely upon the substance and legal effect of the agreement, and not upon the particular words used.

The allegation that the parties understood at the time, that a priority was given by the record, to the mortgage first recorded, in each town, so far from being unsupported, as the respondents allege, is abundantly made out, in the case.   It is proved both that there was such an agreement, as is set up in the bill, as to the mode of record in the different towns, and that the parties so understood the effect of it at the time.   Crosby and Farrar in their answer admit that it was proposed, and not objected to, that the complainant's " mortgage should be sent to Fitzwilliam, and there recorded, while the mortgage to these defendants was being recorded in Troy," and that they " did suppose that the effect of a prior record in Fitzwilliam, of the property there, might be to give a prior right to the mortgage to the plaintiffs." Kimball, in his answer, says: " It was agreed that the mortgage to the defendants should be first recorded in Troy, and that to the complainants should be first recorded in Fitzwilliam, and that each mortgage should be recorded in each town." With these admissions upon the record, the complainants were relieved from the necessity of going minutely into evidence upon these points.   That the mode of recording the mortgages was agreed upon at the time, appears further from the testimony of Joshua Wyman, in answer to the complainants' sixth interrogatory; and from that of James Farrar, in answer to the complainants' eighteenth interrogatory.   The records shew that this agreement was carried into effect.

It also appears, both in the answers and in the testimony, that the parties acted under a mistake as to the necessity of a record of the mortgages in Fitzwilliam.

It is not material that the testimony does not show more fully the terms of the agreement for the sale of the mortgaged property. If the point is established as to the respective interests of the mortgagees in the security furnished, their rights in the proceeds, in the absence of a special agreement, are to be governed by their interest in the security.

Walker, in answer to the twenty-first interrogatory, states that permission was given him to sell any part of the mortgaged property, on the condition that the proceeds should be paid over to either of the mortgagees; and that under this arrangement he did sell a portion of it, the proceeds of which were paid to Kimball. Kimball, in his answer, admits that the property was left in Walker's possession, " with the understanding that the said E. B. Walker & Co. might sell any part of said property, by their paying over and applying the proceeds of the sales to any of the mortgage debts," and that under this agreement he received $175,51 from Walker, as the avails of property sold, which he still holds. This agreement with Walker, and the action under it, are not denied by any of the respondents.

The position which is so strongly insisted on by the respondent's counsel, that on the complainants' own showing, this is a case of tenancy in common, and that they have a perfect remedy at common law, is without foundation. Admitting that a tenancy in common would have been created by the execution of a single mortgage, as was at first proposed, the effect of the final arrangement between the parties was wholly different. The testimony shows that it was agreed by all, that the respondents' deed should be first recorded in Troy, that this was in fact done, and that this gave to the respondents the rights of prior mortgagees on so much of the property as was then in Troy. With what

truth, then, can it be said that the respondents acquired no prior legal rights, and that as to all the property, the parties were tenants in common? The complainants say that while they consented that the respondents should take the rights of prior mortgagees on that portion of the property in Troy, it was further agreed, upon good consideration, that they were to hold it in part for the complainants' benefit, and in trust for them, and that now the respondents seek to enforce their rights to all the property as prior mortgagees; and at the same time repudiate the agreement and trust under which they took it. Knowing the existence of the respondents' mortgage, and having consented to its prior record in Troy, the complainants are hardly in a position to claim the benefit of the doctrine laid down in *Stowe* v. *Meserve*, 13 N. H. Rep. 46. If they have any remedy for the attempted fraud and breach of trust on the part of the respondents, Crosby and Farrar, it is in equity.

The clause in the complainants' mortgage which is relied upon to show that it is subject to the other mortgage, cannot have that effect.

The testimony is strong to show that the deeds were executed at the same time. Kimball says "it was the expectation and understanding of this defendant, that the operation of the mortgages, recorded in the manner above mentioned, would be to put all the mortgages on equal grounds, and he has no doubt that such was the expectation of all concerned." He does not seem to claim any priority in time or otherwise; but states the situation of the property in the different towns as the sole reason why two mortgages were made instead of one, as originally intended. It is a sufficient explanation of that clause in the mortgage to say that it was proper that it should appear upon the record that the property described in both deeds was really the same, to rebut any inference to the contrary. The phrase "which is subject," used in this connexion, would seem to be equivalent to "which is subject to this mortgage." The omission,

if any, could hardly be supplied, grammatically, in any other way. But the decision of this case does not depend upon any such nicety. It is enough that no inference can legitimately be drawn from that clause, favorable to the respondents.

There is a strong improbability of the truth and fairness of the answer of Crosby and Farrar on the face of it. They give no satisfactory explanation of the facts proved or admitted to exist; and these facts and their statement of their understanding of the matter are not in harmony. If they were creditors, seeking their own security, merely, and if Walker was willing to execute a mortgage to them without regard to other creditors, it is somewhat remarkable that the other creditors should have been sent for, before the first security had been taken, and that they should consent to the prior record of the complainants' mortgage in Fitzwilliam, and to the payment to any of the parties, of the proceeds of the sale of any of the mortgaged property. But if Walker insisted, as he says he did, that the security should be for the benefit of all the creditors for whom he had been attempting to provide, and if this was assented to and acted upon in the way that the complainants allege, the facts in the case are consistent with the views and objects of the parties.

No witness was in a position to take a deeper interest in the transaction, or to remember it more accurately, than Walker. He expressly denies that the respondents had or were intended to have any priority, but says that he gave the mortgages for the common benefit of the parties. Wyman and James Farrar so understood it; and it is shown by the testimony of Cutter that Crosby had the same view of the matter at the time, and after he ascertained that all the mortgage debts would not be paid in full; although he had then discovered what he believed to be " a hole in the mortgage " of sufficient capacity to enable him to escape from the fulfilment of his contract. The attempt to impeach the credibility of Cutter has signally failed; and it is believed

that the testimony offered to sustain the bill is entitled to quite as much weight as that of the relatives of Farrar, the respondent.

It appears from the testimony of Walker that he was engaged in providing for the payment of all these mortgage debts when the writs were made against him; and it is worthy of remark that Kimball was not one of the creditors who were pursuing Walker at that time, though his claims are included in what is now attempted to be put forward as the prior mortgage; while Foster, who had a writ, (which we admit was not put into the officer's hands,) was a party to this pretended subsequent mortgage. If the object was to obtain the first security for those who were seeking their legal remedy, why was Kimball a party with Crosby and David W. Farrar? What were his claims to be treated as a prior mortgagee? Was it that he declined going at first, when called upon by Walker for that purpose?

Where two mortgages are taken at the same time, the person receiving them as trustee of two others intending no priority, the fact that one mortgage was recorded before the other gives no priority in equity; but they will be paid ratably. *Rhodes* v. *Canfield*, 8 Paige C. Rep. 545.

If it shall become necessary, the court may hereafter appoint a master to ascertain the amount for which the respondent should account in this case.

The complainants believe that the material allegations in the bill are made out, and that they are entitled to relief, both on the ground of a breach of trust and an attempted fraud on the part of the respondents.

GILCHRIST, C. J. The bill alleges that E. B. Walker and Company being in failing circumstances, and being indebted both to the plaintiffs and to the defendants, proposed to mortgage their personal property, for the security of these debts, provided it could be done so that all the creditors should stand upon equal grounds. A part of the property

was situated in Troy and a part of it in Fitzwilliam, and for the purpose of accomplishing their object, it was agreed that there should be two mortgages, one to the orators, and the other to Crosby, Farrar and Kimball, three of the defendants, that each mortgage should include all the property, and should be recorded in each town, that the mortgage to the orators should be first recorded in Fitzwilliam and the other mortgage should be first recorded in Troy, and it was alleged that the mortgagees agreed to hold the property in trust for the common benefit of all.

These allegations are all denied by the answers. Kimball, in his answer, states that he thinks it was the understanding of all concerned, that the effect of the mortgages, recorded as above, would be to put all the mortgagees on equal ground.

The question is not so much whether the parties supposed they had accomplished this object, as whether there was, in fact, such an agreement as is alleged in the bill. There is no evidence in the case, tending to prove the allegation in the bill, that the mortgagees should hold the property in trust for the benefit of all. Two witnesses for the defendants, Daniel W. Farrar and Edward Farrar, testify that they heard nothing said among the parties on that subject.

It is not only necessary that the substance of the case made by each party should be proved, but it must be substantially the same case as that which he has stated upon the record. In the case of *Hobart* v. *Andrews*, 21 Pick. 526, an assignment was stated in a bill in equity to be absolute; and it was held by the court that if it should appear at the hearing that there was a condition, the performance of which the plaintiff would be bound to show, the variance might then be taken advantage of. In *Colson* v. *Thompson*, 2 Wheat. 336, it was held that where the complainant failed to prove the contract stated in the bill, it must be dismissed. In *Mortimer* v. *Orchard*, 2 Ves. 243, the plaintiff prayed specific performance of a given agreement, set out in his

bill, of which he gave evidence in writing which made it no more than a parol agreement, but the parol agreement proved was quite different. It was held that it was impossible to decree upon the prayer of the bill, for then the court must decree contrary to the evidence of the plaintiff. In *Legh* v. *Haverfield*, it was held that where an agreement appeared to be different from that set up by the bill, the bill must be dismissed. 5 Ves. 452. In *Daniels* v. *Davison*, 16 Ves. 249, a bill stated an agreement to sell certain real estate " provided the said premises are copyhold." Lord Eldon said, " There is by no means sufficient evidence that all the premises are copyhold," and that in order to decree a specific performance, the subject must be proved as it is described. The specific performance of an agreement to grant a lease for three lives cannot be decreed upon what amounts to evidence of an agreement to grant a lease for one life only. *Lindsay* v. *Lynch*, 2 Sch. & Lef. 1. In *Denniston* v. *Little*, 2 Sch. & Lef. 11, the general practice of the court is said to be to compel parties who come for the execution of agreements, to state them as they ought to be stated, and not to set up titles which, when the cause comes to a hearing, they cannot support. Story Eq. Pl. § 394 note. '

The consequences of holding the respondents as trustees are very different from those which follow if they are regarded as tenants in common.

If they are trustees, they hold their mortgage for the benefit of all parties, and if they have been diligent and have realized the full value of the property, by attending closely to it, the orators must share in the profits of it. The defendants could not cause the property to be sold, and become the purchasers of it themselves and reap the exclusive benefit of the sale, for the gain on the transaction would be shared by the orators. *Sparhawk* v. *Allen*, 1 Foster's Rep. 9.

It appears from some part of the evidence, that one of the orators was present and forbade the sale. They might

have purchased the property themselves, but they did not see fit so to do. If the defendants are to be regarded as trustees, they must account for the profits derived from that sale, and the orators will reap the benefit of the act they have forbidden the defendants to perform.

It would seem, also, that the defendants cannot be regarded as acting in the capacity of bailiffs, expressly by the authority of the orators, or by implication, as managers of the property without any dissent on the part of the plaintiffs. 1 Story Eq. Jur. § 466.

At appears that the defendants assigned their interest in the mortgage. The orators did not assert their rights under their mortgage, although they might have done so, had they chosen. It is evident that the transaction relating to the sale of the property in Massachusetts, would be materially affected by regarding the defendants as trustees, and not as tenants in common.

These considerations furnish a sufficient reason why, upon the facts in this case, the bill cannot be maintained, but it may be asked whether, as tenants in common, the respondents are not answerable to the orators in an action at law. Rev. Stat. 358 § 4. It may also be questionable whether, as the defendants merely assigned their interest in their mortgage, they could be called upon to account to the orators in equity for any part of what they received.

*Bill dismissed.*