## WENHAM v. SWITZER.

(Circuit Court of Appeals, Ninth Circuit. January 15, 1894.)

### No. 96.

1. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—ACCEPTANCE OF OFFER.
    Defendant, owning a half interest in a lode mining claim, wrote plaintiff that the other half was for sale, but that it could not be bought for less than a certain sum, and that, if plaintiff wished to buy, he had better send defendant such sum. Plaintiff, in answer, sent part of the amount, and gave defendant authority to telegraph for the balance. Defendant paid more than the amount named, purchasing in his own name. *Held*, that the correspondence created no contract, agency, or trust, binding on the parties, enforceable in equity. 51 Fed. 351, affirmed.

2. SAME—DILIGENCE OF PLAINTIFF.
    After defendant had purchased, he wrote plaintiff, offering to convey a half interest in the claim for a certain sum, on plaintiff's sending enough money to amount, with his deposit on hand, to such sum. Plaintiff did not answer for 10 months, and then did not send the amount named. *Held*, that there was no contract enforceable in equity. 51 Fed. 351, affirmed.

Appeal from the Circuit Court of the United States for the District of Montana.

In Equity. Suit by A. A. Wenham against William S. Switzer to compel specific performance of a contract. Bill dismissed. 51 Fed. 351. Plaintiff appeals. Affirmed.

This is a suit in equity to compel the specific performance of a contract. It is alleged in the bill that appellant, Wenham, who is a resident and citizen of Cleveland, Ohio, and respondent, Switzer, who is a resident and citizen of Butte, Mont., in April, 1888, entered into a contract to purchase the Burner lode mining claim, situate in Summit Valley mining district, Silver Bow county, Mont.; that respondent had the sole management of the negotiations for the purchase of the property, and agreed to purchase the same for the joint benefit of appellant and respondent, each to have an undivided half interest therein; that, at the time the agreement was made, it was not known for what price the property could be obtained; that appellant advanced and paid to respondent, on account of said purchase, the sum of $500, which was to be applied for the purchase; that afterwards, in the month of May, 1888, appellant represented to respondent that the property

could be bought for $3.000, and that appellant paid respondent the further sum of $1,000 for the purchase of the property; that in June, 1888, the respondent purchased the property, and represented to appellant that he had paid $4,000 therefor, and that there was a balance due from appellant of $500; that respondent purchased the property, and took a deed therefor in his own name; that appellant, prior to bringing this suit, tendered to respondent the further sum of $500, with interest, and requested and demanded a deed for the undivided one-half interest of said property, which respondent refused to make.

Respondent, in his answer, admits that he received the $500 and the $1,000, but denies that he received the same on account of the purchase of the Burner lode, or that he used the same in making that purchase. The other essential averments of the bill as to the agreement to purchase the property for the joint benefit of the parties are denied in the answer. The evidence relied upon to support the averments of the bill consists of extracts taken from general letters, written at various times by the respective parties, principally relating to the condition of certain mining properties in which both parties had an interest.

Respondent, on the 20th day of October, 1887, being then the owner of an undivided one-half interest in the Burner lode, wrote a letter to appellant, wherein he referred to this property as follows: "Mr. Wenham: If you have a friend who desires one-half of a good claim lying alongside of the Alta lode, which I think can be got for fifteen hundred dollars, I wish you would let me know. Some time ago I bought one-half of it. It cost him about two thousand dollars. He is not a miner. * * * It slopes north to our south line of the Alta, while our ground slopes south; so sloping together. It's cheap, I think. Two large veins run lengthwise through it east and west,—same course as ours. And please let me know. From now until spring is the time to pick up property cheap. If you think a sale can be effected, I will send you a copy or a plat of it, as it lays adjoining our grounds, —the Alta lode claim. Then any one can come out. Or I will get a deed of it in the bank, and the exchange can be made either way; and I will get it cheap, as any price can be had for it."

Appellant answered this letter, making inquiries as to the property. March 7, 1888, respondent wrote to appellant: "I think you will do well to secure the interest I spoke of joining the Alta claim." In reply to this letter, appellant, on March 15th, wrote to respondent: "Now, about the claim adjoining the Alta, I want to go in with you. Could the interest be bought for one thousand dollars?" On April 5th appellant wrote as follows: "How about the claim adjoining the Alta claim? Can you secure the ½ you spoke of? Let me hear from you as soon as practicable." On April 13th respondent wrote to complainant in reply, as follows: "In relation to the interest nearest the Alta, it can't be had for less than about fifteen hundred dollars, if it can be bought at any price: but I shall know in about twenty days, and I will write you as soon as I can get to know what I can let you have it for. He may get excited, and ask more. * * * One thing more: If you conclude to take the interest, you had better send fifteen hundred dollars to the First National Bank of Butte, as, if you wait, it may slip into other hands. I am good for all you send me." On April 23d, appellant replied: "Yours of the 13th at hand, and contents noted. According to your wishes, I inclose you five hundred dollars payable to your order. * * * Now, if you go quietly to work, and not let the party who wants to sell get excited, when he agrees to sell, give him the five hundred dollars to bind the bargain, and you can telegraph me for the other one thousand dollars, which I will send immediately on receipt of notice, and, if you can't buy all of his interest, buy half of it. * * * In regard to the claim next to the Alta, please keep it confidential until something is done; and, by the way, what is the name of the claim? * * * P. S. If you did not want to use the money immediately, you could make a special deposit in the bank till you needed it." On April 28th respondent replied: "Yours of the 23d, '88, is received, with one check of five hundred dollars on the First National Bank of Cleveland, Ohio. The mining lode claim is known as the Ontario or Burner lode mining claim. Soon as I can hear from the party, the matter

will be concluded. The money is in bank." On June 4th appellant wrote respondent: "Mr. C. C. Frost * * * wants five hundred dollars. * * * Now, friend Switzer, if you think Mr. Frost can give a good deed as security, and you think best and safe to loan him the money, you can give him the five hundred dollars I have in your care, and I will send you more to take its place." This money was not loaned to Frost.

On June 5th, respondent wrote appellant: "In relation to the Burner mining property, I have got it all and paid for it, and surveyed it for patent, but am doing one hundred dollars' worth of work, so as to have over six hundred dollars' worth of work, which will be a necessary improvement. I am sure of two veins on the ground. But it cost more than fifteen hundred dollars; it cost me about four thousand dollars, all told; but I was determined to have it if it cost more. It will pay to hold when patented. Property is rising in Park canyon. Under the circumstances, I had to take a deed in my own name, and of course had to pay for it on delivery of the deed, and came near losing it at that. Others would have taken it at higher figures. Now, friend A. A. Wenham, send me fifteen hundred dollars, and I will make you a deed of one undivided one-half of the entire Burner property, free of all work excepting the one hundred which I am now doing, which work will be over six hundred dollars,—sufficient to get the patent. Then you will have to stand one-half the expenses of the patent, which only is the regular price in this district and territory. As I have received five hundred dollars of you, so the balance, fifteen hundred dollars, will make the purchase money of your part two thousand dollars. I will [write] you more in detail next letter." Appellant testified upon the trial that he answered this letter, asking Mr. Switzer for full description and plat and other particulars. No such letter was produced, and respondent testified that he had never received any such letter. Respondent testified that, after his letter of June 5th, he wrote to Mr. Wenham "that this money must be paid within thirty days." Appellant testified that he never received the letter. The next letter that appears in evidence is written April 6, 1889, by appellant to respondent,—10 months after the letter of June 5, 1888,—and reads as follows: "Not having heard from you since some time last April or May, I have felt as though you had rather neglected my last letter, written to you some time in the early part of June last. However, as you are the senior, I accept the situation. I inclose check on N. Y. for one thousand dollars. Please let me know how much you figured to be the balance. You now have fifteen hundred dollars in total from me. I have thought it quite strange that I had not heard from you. However, I suppose you would write when you were ready; but, as it was a matter of business, I thought it my duty to write to you now, as time was drawing close."

On May 20, 1889, appellant wrote as follows: "On Apr. 6th I sent you by registered letter one thousand dollars, to apply on my half of the Burner lode claim, together with the five hundred dollars I advanced you some time ago. Please let me know if you received the draft all right, and the amount due you still, and I will remit you so you can mail me deed of same. Please let me hear soon as possible, so I may know that the draft arrived safely."

On May 30, 1889, respondent wrote to appellant: "Your note of April 6, '89, containing one check of one thousand, which I deposited in the First National Bank for safe-keeping until you call for it; also your five hundred check is in bank subject to your order. Now, the best investment I can make with the money for you is in the Monitor property, which I think will be safe. By your request, and Mr. C. W. Pomeroy's request, I will make you a deed for fifteen hundred shares of the Monitor, shares at one dollar per share. I can't make you any deed to or in the Burner ground."

Upon this evidence the circuit court dismissed the bill, and entered judgment in favor of respondent for his costs.

R. L. Word and Robert B. Smith, for appellant.

Aaron H. Nelson, for appellee.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, (after stating the facts.) It will readily be seen from the facts that the proofs made do not correspond with the allegations of the bill to the effect that respondent agreed to purchase the Burner lode for the joint benefit of the parties. Respondent was the owner of an undivided one-half interest of the Burner lode claim at the time of the commencement of the correspondence between the parties in relation thereto, and the negotiations had reference only to the purchase of the other undivided one-half interest. But, notwithstanding this variance between the pleadings and the proofs, we shall consider the case upon its merits.

What was the contract, if any was made, between the parties? Are any facts shown that entitle appellant to a decree? The voluntary offer or suggestion of respondent, which constitutes the basis or origin of any agreement between the parties, is contained in the first letter, informing appellant that respondent knew of an interest in a mine (not naming it) which he thought could be bought for $1,500, and wanted to know if appellant knew of any friend that would like to buy it. Subsequently, in March, respondent suggests that appellant would do well to secure the interest mentioned in the former letter. Appellant replied, expressing a desire to obtain the interest, and wished to know if it could be bought for $1,000. Then comes the reply that the interest could not be had for less than $1,500, if it could be bought for any price, with the suggestion that, if appellant should conclude to take the interest, he had better send $1,500, because, if delay was made, the interest might slip into other hands. Instead of sending this amount of money, appellant sent a draft for $500, and suggested to respondent that he should give the owner, when he agreed to sell, the $500 to bind the bargain, and then telegraph for the other $1,000; and upon the receipt of this letter the respondent said that, as soon as the party could be heard from, the matter would be concluded. This, in substance, was the extent of the negotiations prior to the time respondent purchased the property. There was no contract created by any or all of the letters up to this time. The minds of the parties had never met upon any mutual understanding as to the price which was to be paid for the undivided one-half interest in the Burner lode. The respondent had stated that it could not be bought for less than $1,500, but he never stated that it could be bought for that sum. Respondent had never agreed to advance any money to appellant in making the purchase. On the other hand, he informed appellant that, if he wished to buy, he had better send $1,500. This suggestion was answered by sending only $500, with authority for respondent to telegraph for $1,000 more, and, if he could not buy the interest for that, to buy half of it, without stating what sum should be given for the half. If, up to this time, any contract could be inferred, it would only be to purchase the undivided one-half interest in the Burner lode for $1,500. Appellant had never authorized the respondent to pay any more. The minds of the parties had never mutually come together

on any other proposition. The parties had never assented to the same thing, in the same sense, in any other way or manner. If respondent paid more than $1,500 for the interest, he could not, under any agreement or contract then existing between the parties, have compelled appellant to pay more than $1,500, and it would have been optional upon the part of appellant to take the interest, or refuse to take it, if any greater sum had been paid. Respondent had never agreed to advance any money to make the purchase. He had $500 of appellant's money that could be applied for the purchase of the interest, and he was only authorized to telegraph for $1,000 more. If he paid more, the purchase would be on his own account. Unless both parties were bound by the contract, it could not be enforced in a court of equity.

"To entitle a party to specific performance, there must not only be a valid and binding agreement, but, as a rule, the contract, at the time it was entered into, must have been capable of being enforced by either of the parties against the other." Wat. Spec. Perf. Cont. § 196; Bish. Cont. § 78. There was no contract, agency, or trust created by the acts or conduct of the parties prior to the purchase which would bind both parties, unless the purchase was made for $1,500.

Is it not equally clear that there was no binding contract made between the parties after the purchase of the interest by the respondent? The letter of respondent of June 5, 1888, contains the first and only direct offer that was made. This letter is clear, plain, positive, and certain in all of its proposals, terms, and conditions. It is open, frank, and friendly. There is nothing ambiguous, equivocal, or evasive about it. It is easily understood, and it called for a direct and positive answer. It was a voluntary offer on the part of respondent to convey to appellant an undivided one-half interest in the Burner lode for the sum of $2,000, with a statement of about what the other expenses in doing necessary work and procuring a patent would be. Respondent had in his hands $500 of appellant's money. This letter gave to appellant an option to purchase the interest by accepting respondent's offer, and sending $1,500 to complete his part of the purchase money. "Now, friend Wenham, send me fifteen hundred dollars, and I will make you a deed of one undivided half of the entire Burner property." This was the offer that was made. In order to avail himself of this offer, the law, in the absence of any specified agreement as to time, would require appellant to send the money within a reasonable time. This was not done. There could be no acceptance of the offer without sending the $1,500. This was the consideration upon which the offer was made. The offer was made by letter sent by mail. It was duly received by appellant. No answer was made to it for a period of 10 months, and then the offer was not directly accepted, and the conditions of the offer were not complied with.

The letters of the appellant written on the 6th of April and 20th of May, 1889, ignore any reference to the offer that was made by respondent in his letter of June 5, 1888. The language of these let-

ters, in the light of the previous correspondence of the parties, is very remarkable, equivocal, ambiguous, and uncertain. "Not having heard from you since some time last April or May." This was certainly a mistake, for appellant admitted upon the trial that he had received respondent's letter of June 5th. "I have felt as though you had neglected my last letter, written some time in the early part of June last." What letter? Was it the one about loaning the $500 belonging to appellant, in the hands of respondent, to C. C. Frost? Or is it the one which appellant testified as having written in reply to respondent's letter of June 5th, asking for plats and specifications? Then appellant inclosed a check for $1,000, and said: "Please let me know how much you figured the balance to be." Did not appellant know just how much money was required to be sent, if he accepted respondent's offer, to obtain the deed for an undivided one-half interest in the Burner lode? There is no statement even that he accepted the offer or asked for further time to pay the money. There is no pretense that respondent, for or without a consideration, ever promised or agreed to extend the time for the payment of the money. There is no claim that respondent made any misrepresentation, or that he was guilty of any fraud in the premises.

The evidence fails, in every essential particular, to support the allegations of the bill. No case is made out that would justify a court of equity to compel respondent to execute the deed as prayed for. The rule is fundamental that a party seeking the remedy of specific performance must show himself to have been "ready, desirous, prompt, and eager" to comply with the contract on his part. 3 Pom. Eq. Jur. § 1408, and authorities there cited; Penn v. McCullough, (Md.) 24 Atl. 424. If appellant was ready, anxious, and desirous of availing himself of the voluntary offer of respondent, he should have been eager and prompt to perform his part by sending the money—$1,500—upon the receipt of respondent's letter. In Mix v. Balduc, 78 Ill. 215, the court held that, where the purchaser of land delays offering payment of the purchase money for five months after the stipulated time for payment, without any excuse therefor, his right to call for a specific performance will be thereby precluded, unless the stipulated time for payment has been waived.

Specific performance of a contract is not a matter of absolute right, but rests entirely in sound judicial discretion, to be exercised according to the settled principles of equity with reference to the facts of each particular case. The facts in this case fail to show any consideration for the contract. Appellant was lacking in the exercise of good faith, and did not comply with the offer made to him with reasonable diligence. There is no clear and satisfactory evidence of any such acceptance or compliance with the terms of respondent's voluntary offer, or of the existence of any agency, trust, or contract between the parties, as would justify a court of equity in granting a decree of specific performance. Colson v. Thompson, 2 Wheat. 336; Purcell v. Miner, 4 Wall. 513, 519; Williams v. Morris, 95 U. S. 456; Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109; Walcott v. Watson, 53 Fed. 429; Evans v. Lee, 12 Nev.

399; Agard v. Valencia, 39 Cal. 301; Magee v. McManus, 70 Cal. 553, 12 Pac. 451; Strange v. Crowley, 91 Mo. 287, 2 S. W. 421; Durant v. Comegys, (Idaho,) 28 Pac. 425; 1 Chit. Cont. 11; Bish. Cont. § 327; 1 Story, Eq. Jur. §§ 764, 767; Wat. Spec. Perf. §§ 135, 138, 186, 196; 3 Pom. Eq. Jur. § 1405; 5 Lawson, Rights, Rem. & Pr. § 2607.

The judgment of the circuit court is affirmed, with costs.